## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANNE DAUER** | : | |
| **Plaintiff,** | : | |
| | : | **No. 20-cv-00831 (VLB)** |
| **v.** | : | |
| | : | |
| **VINEYARD VINES, LLC, et al.,** | : | **December 29, 2022** |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKTS. 72, 73]

Plaintiff, Anne Dauer, is a 60-year-old woman diagnosed with persistent atrial fibrillation and cardiomyopathy. She began working for Vineyard Vines, LLC ("Vineyard Vines") (together with Ian and Shepard Murray, "Defendants") in 2007 as the Director of Stores and remained at the Company for the next 13 years. Within that time, her title changed twice: first to Vice President of Retail in 2014 and then to Senior Vice President of Retail in 2015. Additionally, she received merit-based salary increases in 2017, 2018, and 2019. Vineyard Vines tasked Plaintiff in 2019 with opening a substantial number of new stores over the next five years. On or around February 3, 2020, Vineyard Vines terminated her employment.

Plaintiff brought this lawsuit against Vineyard Vines alleging she was fired due to her gender,  age, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (Count III); the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count V); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Count VII);  and

the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.* (Counts IV, VI, VIII). She also contends that Vineyard Vines compensated her less favorably than certain men despite performing equal work in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (Count I) and the Connecticut Equal Pay Act, Conn. Gen. Stat. §§ 31-75, 31-76 (Count II). Finally, she contends that individual defendants Ian Murray and Shepherd "Shep" Murray (together, the "Murrays") aided and abetted the discriminatory termination and pay in violation of CFEPA pursuant to § 46a-60(b)(5) (Count IX).

Before the Court is Defendants' motion for summary judgment. [Dkt. 72 (Defs.' Mot. for Summ.  J.)]. Defendants argue that Plaintiff's termination claims fail because 1) she cannot show a prima facie case of discrimination based on gender, age, or disability; 2) Michael Gaumer, the President of Vineyard Vines, fired her for a legitimate, nondiscriminatory reason: insufficient job performance; and 3) she fails to demonstrate that the alleged insufficiency is pretextual. Regarding the pay disparity claims, Defendants argue that Plaintiff fails to introduce proper comparators. Finally, Defendants argue the aiding and abetting claim fails because there is no evidence that the Murrays played any role in her termination or compensation.

For the following reasons, the Court DENIES Defendants' motion for summary judgment as to Counts III through IX (gender, age, disability, and aiding/abetting) and GRANTS the motion as to Count I and II (equal pay claims).

I.    **FACTUAL BACKGROUND**

The following facts are taken from the parties' Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most favorable to the non-movant, Anne Dauer.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.  Company Background

Vineyard Vines markets clothing and accessories for men, women, and children. [Dkt. 80 (56(a)(2) Stmt.) ¶ 1]. Brothers Ian and Shep Murray cofounded the Company and have served as its co-CEOs for at least the past 10 years. [*Id.* at ¶ 2]; [Dkt. 89-2 (Defs.' Resp. to Pl's Stmt. of Additional Facts) ¶ 124]. Gaumer was at all relevant times President of Vineyard Vines and reported directly to the Murray brothers. [Dkt. 80-9 (Gaumer Dep.) 13:19-14:15].

As cofounders and co-CEOs, the Murrays were directly involved in the hiring of managers for the high-profile, high-volume stores that they often visited, which included the stores in Greenwich, Westport and on Martha's Vineyard. [Dkt. 89-2 at ¶ 238]. They had a practice of inviting members of store management from stores around the country to work at the Vineyard Vines store in Martha's Vineyard for part of the summer and would determine which of the potential managers would be selected to work at the Martha's Vineyard store. [*Id.* at ¶ 239]. Additionally, the Murrays were directly involved in hiring senior management and executives at the

headquarters office, i.e., candidates could not fill these positions without the brothers' approval.[1] [*Id.* at ¶ 241].

B. <u>Plaintiff's Responsibilities</u>

Vineyard Vines hired Plaintiff as Director of Stores in November 2007 when she was 47 years old. [Dkt. 80 at ¶ 12].  In that role, Plaintiff led Vineyard Vines' strategy for growth of its retail stores. [*Id.* at ¶ 13]. Specifically, she was responsible for opening and operating stores across the United States and building each store's team. [*Id.* at ¶ 14].  Plaintiff's responsibilities included overseeing the Company's multimillion-dollar investment to open ten stores in California—a significant growth opportunity for Vineyard Vines. [*Id.*]. Beginning in 2010, Plaintiff reported directly to Gaumer. [*Id.*].

Effective March 2014, Plaintiff's title changed to Vice President of Retail, and then in March 2015, her title became Senior Vice President ("SVP") of Retail. [Dkt. 89-1 (Defs.' Resp. to Pl's 56(a)(2) Stmt.) ¶¶ 17-18].[2]

As SVP of Retail, Plaintiff led the Retail division and was responsible for (i) improving Retail performance; (ii) defining a strategy for the Retail team and leading the field organization toward accomplishing company goals, and (iii) coordinating with her cross-functional partners in execution of the defined Retail

---

[1] **Defendants' response to this fact is inconsistent. In one instance, they do not dispute this fact. Immediately thereafter, they argue that this fact is inadmissible hearsay as Plaintiff only relies on her own declaration. For the purposes of this summary judgment motion, the Court construes this fact as true given both Defendants' admission and Plaintiff's signed declaration. *Walsh v. New York City Hous. Auth*., 828 F.3d 70, 80 (2d Cir. 2016) (finding discussion of plaintiff's affidavit appropriate and rejecting argument that "self-serving" affidavits are insufficient to survive summary judgment). [Dkts. 89-2 at ¶ 241; 80-7 (Dauer Dec.) ¶ 14].**

[2] **The parties dispute whether the title changes were promotions.**

strategy. [Dkt. 80 at ¶¶ 19, 29]. She was not responsible for wholesale or online/e-commerce. [*Id.* at 19].

Plaintiff was responsible for store profitability. [Dkt. 80 at ¶ 40]. The profitability of the retail business could be improved by (i) increasing sales (revenue coming in) and (ii) controlling and reducing costs (money going out). [*Id.*]. Additionally, Plaintiff was responsible for managing payroll, the largest and most controllable expense to drive profitability. [*Id.* at ¶ 41]. Plaintiff met regularly with Gaumer, as well as with leaders in finance, operations, and Retail's field leadership, about managing payroll. [*Id.* at ¶ 42].

In 2016, Plaintiff's salary was $320,330. [Dkt. 80 at ¶ 24]. Gaumer approved two salary increases: $329,940 in 2017 and $339,838 in 2018. Vineyard Vines policy is that salary raises are provided based on merit and Gaumer gave Plaintiff salary raises in 2017, 2018 and 2019. [Dkt. 89-2 at ¶ 168].

In early 2019, Vineyard Vines directed Plaintiff to lead the opening of additional stores for the next five years. [Dkt. 89-2 at ¶ 219].

C. Plaintiff's Heart Condition

On September 23, 2019, Plaintiff was hospitalized due to an elevated irregular heart rate caused by atrial fibrillation ("AFib").[3] [Dkts. 89-1 at ¶ 97; 89-2 at ¶ 215]. She was diagnosed as having persistent atrial fibrillation and cardiomyopathy. [*Id.*] Plaintiff never requested or applied for an accommodation,

---

[3] The Center for Disease Control defines atrial fibrillation as the most common type of treated heart arrhythmia. An arrhythmia is when the heart beats too slowly, too fast, or in an irregular way."
https://www.cdc.gov/heartdisease/atrial_fibrillation.htm

short term disability benefits, or a leave of absence. [Dkt. 89-1 at ¶ 98]. Gaumer and Ian Murray testified during their depositions that they knew Plaintiff was hospitalized but deny having any knowledge of why she was hospitalized. [Dkt. 89-2 at ¶ 217]. Plaintiff, however, states that she explained the diagnosis and treatment plan to both Gaumer and Shep Murray during phone calls while hospitalized. [Dkt. 80-7 at ¶ 8].

Beginning on January 13, 2020, Plaintiff was away from work for five days for a heart procedure. [Dkt. 89-2 at ¶ 220]. She informed Gaumer of the procedure and absence in advance. [*Id.*]. She returned to work on January 20, 2020. [*Id.*]*.*

### D. Discriminatory Comments

In her deposition, Plaintiff testified about a discriminatory comment made during a 2016 or 2017 leadership meeting. She explained, "[there] was a senior leadership meeting on a Monday where Ian Murray walked into the boardroom and made the comment that there were too many middle-aged wom[e]n around the table, and we needed to shake it up, something along that." [Dkts. 80-14 (Dauer Dep.) 432:11-18; 89-1 ¶ 112]. She caveated, "I don't want to be quoted under testimony. That was the gist of the comment." [Dkt. 80-14 at 432:11-18].

Two other women provide declarations affirming that such comments were made at leadership meetings.

Lindsey Worster, former Vice President of Marketing declares:

At numerous [senior leadership] meetings in 2018 and 2019, both Ian Murray and Shep Murray commented to the leadership group that there "are too many middle-aged women" around this table. These exact words were used on more than one occasion and comments to the same effect were made at other meetings. Mr. Gaumer was present when these comments were made and he did not dispute the Murrays

6

or otherwise indicate any disagreement with them. The manner in which these comments were made was not in the vein of levity and they were not taken by me to be in jest. The comments were made in a manner indicating frustration that the company's "look" was too old. A recurring topic at these meetings was that the company needed to look more like its target customers, which the Murrays and Gaumer viewed as young men. Mr. Gaumer often made comments to that effect as well at these meetings, i.e., that the company needed to look more like the perceived target of young men.

[Dkt. 80-5 (Worster Dec.) ¶ 3].

Elizabeth Ambargis, former Chief Financial Officer alleges in her declaration:

I had regularly scheduled meetings with the Co-CEO's and the President as well as numerous ad hoc meetings. At several of these meetings, including meetings in 2019, both Ian Murray and Shep Murray commented that there "are too many 50-something year old women sitting around the leadership team table." These words were used on more than one occasion. Mr. Gaumer was present when these comments were made and he did not dispute the Murrays or otherwise indicate any disagreement with them. The manner in which these comments were made was one of seriousness and I did not take it to be a joke or attempt at humor.

[Dkt. 80-4 (Ambargis Dec.) ¶ 3].

Separately, a former male employee, Alexander Taylor, declares:

In a senior level creative review meeting, Ian Murray said that I and other older employees were no longer what the company needed now, and that now the company needed people 20 years younger than me. At the time of this conversation, I was 42 years old.

[Dkt. 80-6 (Taylor Dec.) ¶ 6].

E.  <u>Pattern of Terminations/Resignations</u>

Plaintiff alleges in her declaration that the following women have been

terminated since 2017:

> Beth Ambargis (Chief Financial Officer), Joanne Marciano (Senior Vice President of Operations, Planning and Allocation), Lisa Ellis (Vice President of Human Resources), Margie Wolf (Director of Training and Customer experience), Millie Harris (Store Manager in Greenwich, Connecticut), and Susan Kim (Store Manager in Kansas City, Missouri). I know each of these women and worked with them directly at [V]ineyard [V]ines. Each was 50 or older at the time of their terminations, except Joanne who was 48. With the exception of Ms. Harris and Ms. Kim, each of these women had either a direct reporting line or dotted line reporting to Mr. Gaumer (President) and/or Ian and Shep Murray (Co-Chief Executive Officers).

[Dkt. 80-7 at ¶ 15].

> Addressing her termination, Ambargis declares:

> [I]n August of 2019, I was fired. I had just returned from a pre-planned, pre-approved vacation. Mr. Gaumer and Mr. Zamparelli met with me and informed me that I was being fired. I was replaced by a younger man. At the time I was fired, I was 56 years old. I had never received a written performance review or negative performance feedback. I was never placed on a Performance Improvement Plan or advised that my employment was in jeopardy due to performance concerns.

[Dkt. 80-4 at ¶ 4].

Lindsey Worster alleges that she resigned in September 2020 primarily

because of "the overall hostile work environment, poor leadership from Mr.

Gaumer, continued disrespect to women and the fact that Mr. Gaumer failed to

follow through on commitments he made to me regarding my position." [Dkt. 80-5

at ¶ 12].

F.  <u>Defendants' Description of Plaintiff's Job Performance</u>

Defendants submitted a declaration from Gaumer as evidence that plaintiff's

job performance was unsatisfactory in the following areas: 1) retail sales, 2) store

profitability, 3) fraud prevention, 4) social media engagement, 5) store visitation, and 6) cross-function collaboration. Plaintiff has submitted evidence disputing the purported job performance issues.

### 1.    Retail sales

Gaumer's first example of Plaintiff's poor performance is that she failed to meet expectations for Retail Sales.  Specifically, he declares:

> For several years before her termination Plaintiff failed to meet my expectations in terms of her personal performance as the SVP of Retail and the performance of the Retail business under her leadership. One important measure of performance for the Retail business is the percentage growth or decline in sales year over year for retail stores open one year or more, i.e., "Comp Store Sales." The total aggregate of declines in Comp Store Sales 2017 through 2019 exceeded $60 million.

[Dkt. 74-2 (Gaumer Dec.) ¶¶ 8-10].

Elizabeth Ambargis, Vineyard Vines Chief Financial Officer from 2012 through August 2019, declares that the decreased Retail Sales were not attributable to Plaintiff, but rather reflective of a shift in sales trends:

> At many of the leadership meetings, the team would discuss company performance. Overall company performance on profits (not just retail store sales) was down in the years 2018 and 2019, which was a trend across most retailers as shoppers shifted their buying behavior to online shopping. During this time, on-line sales of company product was increasing, which again, was a trend across the industry. This resulted in on-line sales or "e-commerce" sales constituting a higher percentage of overall retail sales on a year over year basis. At many leadership meetings during this period, Ian and Shep Murray and Mr. Gaumer stated words to the effect that the drop in retail store sales was not a reflection of Ms. Dauer's abilities or performance but the product of overall industry trends. This was not surprising to me because we understood the interplay between the two channels. Customers browsing in store and buying online, buying multiple sizes of the same product online and then returning the wrong sizes to the store for instance.

> The interplay of the two channels was significant and we had hard data to prove it. I was able to use the data to show the audit partner from KPMG the interplay between the two channels broadly and in specific geographies as well. This allowed us to pivot from evaluating stores based on just the profits in-store sales to evaluating stores based both on store sales as well as e-commerce sales tied to certain geographies. This was important as the company would have faced impairment charges on certain stores if they had been evaluated in the traditional way.

[Dkt. 80-4 at ¶¶ 6-7].

Notably, prior to his declaration, Gaumer agreed that from at least 2018, the trend with Vineyard Vines has been that e-commerce is increasing as a percentage of overall retail sales. [Dkt. 80-9 at 86:6-10].

### 2.    Store Profitability

In his declaration, Gaumer states that he did not believe Plaintiff was championing Retail's implementation and use of Dayforce, a new payroll management program. [Dkt. 74-2 at ¶ 14]. Dayforce provides data on sales per labor hour, customer traffic demands, peak sales periods and other data, and allows for the scheduling of the appropriate employees at the times they are needed, greatly benefitting retailers in reducing the largest controllable expense, payroll.  [*Id.* at ¶ 15].

Plaintiff admits that Dayforce was a great tool and a very effective way to manage payroll. [Dkt. 80 at ¶ 46]. However, Plaintiff did not attend any of the Dayforce trainings and could not recall any functionality outside of scheduling. [*Id.* at ¶¶ 46, 49].

In his declaration, Gaumer states that Plaintiff's failure to engage with the Retail division on the roll-out and use of Dayforce set a bad example for the entire

Retail division and prevented Vineyard Vines from realizing the full potential of the tool. [Dkt. 74-2 at ¶ 17].

### 3.     Bulk-buying Fraud Schemes

Bulk-buying fraud schemes involve individuals purchasing large quantities of products at Vineyard Vines' outlet stores on a substantially discounted basis and then reselling the merchandise in high volume for profit online. [Dkt. 80 at ¶ 58] ("Bulk-buying"). Vineyard Vines prohibits bulk-buying. [*Id.* at ¶ 59]. All field employees and all field management are required to comply with the bulk-buying policy and report violations to Vineyard Vines so fraud can be stopped as early as possible. [*Id.*].

In 2018 and 2019, the rate at which bulk-buying occurred caused material financial losses at multiple Vineyard Vines outlet stores. [*Id.* at ¶ 57]. In his declaration, Gaumer states that "Plaintiff failed to discover either bulk buying scheme and instead celebrated the high sales volumes the bulk buying schemes generated." [Dkt. 74-2 at ¶ 25]. Gaumer acknowledged, however, that an outside loss prevention company investigated the scheme as to one particular store, and the final report did not find Plaintiff responsible nor even mention her name.  [Dkt. 80-9 (Gaumer Dep.) 137:13-142:17].

On September 10, 2019, Vineyard Vines hosted a meeting to review all stores ("Fleet Review") with all Regional Directors and District Managers, as well as certain key functional partners. [Dkt. 80 at ¶ 90]. The meeting was held to discuss retail business performance and retail business plans, including strategies to maximize sales and growth opportunities for the upcoming peak holiday season.

[*Id.*]. On the morning of the Fleet Review, the Regional Director with oversight of the stores involved in the bulk-buying fraud scheme resigned. [*Id.* at ¶ 91]. Within days, the District Manager over those stores also resigned, and Vineyard Vines fired five store managers and two assistant managers of the impacted stores. [*Id.*].

In her deposition, the Vice President of Human Resources, Lorin Dunphy, who planned the meeting, acknowledged that district managers were expected to present but could not recall whether Plaintiff was expected to present. [Dkt. 80-12 (Dunphy Dep.) 42:19-43:10]. On redirect, Dunphy stated that she expected Plaintiff to help plan the meeting and participate during the meeting. [*Id.* at 103:17-24].

### 4.    Visiting Stores

In his declaration, Gaumer states:

I also believed that Plaintiff should be visiting more [V]ineyard [V]ines retail locations. In 2020, we had more than 100 stores in 34 states. For example, [V]ineyard [V]ines made a multimillion-dollar investment to open ten stores in California, an area of large opportunity that was underperforming, and yet Plaintiff never visited those stores in the three years prior to her termination (2017-2019).

[Dkt. 74-2 at ¶¶ 26-27].

Plaintiff states the following in her declaration:

On numerous occasions during my employment, including in 2017, 2018 and 2019, Mr. Gaumer directed me to cancel visits I had planned to various of the more than 100 [V]ineyard [V]ines stores across the country. Mr. Gaumer required that I, along with other direct reports, submit our calendars to him on a weekly basis and thus he could determine if I had plans to be out of the headquarters office. On many occasions he directed me to cancel planned store visits because he wanted me to attend meetings at the office or be available for other company business.

[Dkt. 80-7 at ¶ 4].

12

### 5.   Social Media Engagement

**Gaumer also identified Plaintiff's lack of social media engagement as a performance deficiency. [Dkt. 74-2 at ¶ 12] ("In addition, despite customers increasingly engaging with [V]ineyard [V]ines on social media, from my perspective, Plaintiff refused to embrace social media and would not review social media posts for the Retail division.").**

**Lindsey Worster, former Vice President of Marketing from 2017 through September 2020, submitted a declaration that social media fell outside the scope of Daurer's responsibilities.**

> **As Vice President of Marketing, my department was in charge of Vineyard Vines' social media presence. This was not Ms. Dauer's responsibility. Further, it was the responsibility of the marketing department to devise new ideas and strategies for attracting consumers to the Vineyard Vines' stores. This was not Ms. Dauer's responsibility.**

**[Dkt 80-5 at ¶ 6].**

**Defendants concede that marketing, not Plaintiff, was responsible for social media but contend that this fact is immaterial. [Dkt. 89-2 at ¶ 207].**

### 6.   Cross-functional partners

**Gaumer testified in his deposition that he believed Plaintiff, as the Retail leader, was not doing enough to "pull cross-functional partners together to try to positively impact the…retail business for which she was responsible." [Dkt. 74-7 at 87:2-5].   One such instance involved collaboration with Karen Beebe, the Company's CIO and SVP, Operations. [Dkt. 74-6 (Dauer Dep.)  239:16-240:3]. Beebe informed Plaintiff that she had not been responsive to an initiative they were**

working on together. [*Id.*]. In her deposition, Plaintiff explained that she informed Beebe of other priorities, apologized, and the two moved forward. [*Id.*].

G. Termination

According to Gaumer, he first decided to fire Plaintiff in January 2019. [Dkt. 80-9 at 51:3-8]. He testified at his deposition that he then consulted with the Murrays because "[he] wanted to get perspective from Shep and Ian and they had some questions in terms of…her performance." [*Id.* at 51:19-25; *see id.* at 50:14-17 ("I solicited input and perspective from Shep and Ian Murray."]. However, Gaumer did not fire her at this point.[4]

From January 2019 through late August, Gaumer, Shep, Ian, Dunphy, and Zamparelli discussed Plaintiff's performance. [Dkt. 80-12 at 53:6-54:22]. Shep Murray claimed that Beth Ambargis told him that Plaintiff was not the right person to lead a retail turnaround. [Dkt. 80-11 (S. Murray Dep.) 40:24-42:18]. Ambargis denies ever saying any such thing and in fact believes Plaintiff was a strong leader at Vineyard Vines. [Dkt. 80-4 at ¶ 9].

---

[4] Defendants allege that in January 2019, Zamparelli and Dunphy, with outside counsel, prepared a draft communication plan regarding the termination of Plaintiff's employment. [Dkt. 80 at ¶ 77]. When asked about the communication during his deposition, Zamparelli asserted attorney-client privilege. [Dkt. 80-13 (Zamparelli Dep.) 75:18-22]. The Second Circuit has made clear that "[a] defendant may not use [attorney-client] privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Accordingly, the Court will not consider this draft communication.

Gaumer alleged that by late August or early September, he no longer viewed the performance issues as fixable and decided Plaintiff should be terminated. [80-9 at 51:3-52:19]. He admits that there is no documentation supporting that alleged decision. [*Id.* at 152:11-15]. Explaining why he did not terminate Plaintiff in September 2019, Gaumer testified in his deposition:

> We had an all-hands company meeting scheduled for October and then we'd be right into our peak season for sales. I believed that separating her at that time would cause an undue disruption, both to their field teams as well as the rest of the organization. So, I elected to wait until January, until after the peak season was over.

[*Id.* at 149:18-150:8].

Simultaneously in September 2019, Plaintiff was hospitalized and diagnosed with cardiomyopathy and atrial fibrillation. [Dkt. 89-13 (Medical Records)]. She later underwent a heart procedure, atrial fibrillation ablation, on January 13, 2020. [*Id.* at 4]. Her return-to-work date was January 20, 2020. Two weeks later, on or around February 3, 2020, Gaumer terminated Plaintiff. [Dkt. 80-9 at ¶ 220].

Vineyard Vines never provided Plaintiff with a formal Performance Improvement Plan nor any document advising her that her employment was in jeopardy due to performance issues. [Dkts. 80-9 at 47:12-23; 80-13 at 79:16-80:1, 84:20-85:8; 80-12 at 50:6-51:20, 103:25-105:15].

15

### H. Proposed Comparators

Plaintiff contends two individuals are her comparators: Justin Zamparelli, General Counsel and Senior Vice President of Human Resources, and Greg Ladley, Head of Retail.[5]

Justin Zamparelli joined Vineyard Vines in 2014 as its General Counsel. [89-1 ¶ 26]. He holds a Juris Doctor (JD) and Master of Law in Taxation (LLM) and is a licensed attorney. [*Id.*]. Since 2017, in addition to being General Counsel for Vineyard Vines, Zamparelli has served as SVP of Human Resources. [*Id.*]. In these roles, Zamparelli had oversight over all legal and human resources related issues for Vineyard Vines, which includes employee relations, benefits, talent acquisition, payroll and recruiting. [*Id.*]. In 2017, Vineyard Vines paid Zamparelli $100,000 more than Plaintiff, and in 2018 paid him $144,000 more than Plaintiff. [Dkt. 89-2 at ¶ 247]. In 2019, Zamparelli's salary exceeded Plaintiff's by over $100,000 and his total compensation (salary plus bonus) exceeded Plaintiff by $125,000. [*Id.*].

Greg Ladley joined Vineyard Vines in October 2021 as head of retail for a fifteen-month contract term. [Dkts. 80-10 (Ian Murray Dep.) 26:3-10; 89-5 (Foley Second Dec.) ¶ 8]. Plaintiff does not have evidence of Ladley's compensation information. [Dkt. 80-8 (Rafkin Dec.) ¶ 12].

---

[5] During discovery, Plaintiff also listed Noah Treshnell as a comparator but has since waived this comparison. *See* Local Rule Civ. P. 56(a)(2)(i) ("A party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law."); *Gomez v. City of Norwalk*, No. 3:15CV1434 (MPS), 2018 WL 780213, at *5 (D. Conn. Feb. 8, 2018) (finding Plaintiff waived his argument by failing to raise it in his opposition brief).

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. (citing *Liberty Lobby*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III.    ANALYSIS

Plaintiff brings two types of claims: discriminatory termination and violation of state and federal equal pay laws. For the former, Plaintiff asserts that Vineyard Vines unlawfully terminated her employment based on gender under Title VII and the CFEPA, disability under the ADA and the CFEPA, and age under the ADEA and the CFEPA. 42 U.S.C. §§ 2000e *et seq.*; 29 U.S.C. §§ 621 *et seq.*;42 U.S.C. §§ 12101 *et seq.*; Conn. Gen. Stat. §§ 46a-60 *et seq.* As for the latter, Plaintiff asserts that Vineyard Vines compensated her differently than male comparators in violation of both the Equal Pay Act and the Connecticut Equal Pay Act. 29 U.S.C. § 206(d); Conn. Gen. Stat. §§ 31-75, 31-76. Finally, Plaintiff asserts that the Murrays aided and abetted all the discrimination and pay disparity claims in violation of the CFEPA. Conn. Gen. Stat. § 46a-60(b)(5).

The Court will address all claims in turn, beginning with the discriminatory termination claims.

18

### A.  Discrimination Claims

Courts analyze employment discrimination claims brought under all four statutes with the "now-familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (ADA, Title VII, ADEA); *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (CFEPA).

The *McDonnell Douglas* framework has three steps.  First, it requires the plaintiff to establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802, of which the elements vary for each type of claim.  The Second Circuit has noted that the burden to establish a prima facie case is "minimal" or "de minimis." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

Second, if the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. The defendant need only proffer, not prove, the existence of a nondiscriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).

Third, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination. *See McDonnell*

*Douglas*, 411 U.S. at 804. "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

Before proceeding with its analysis, the Court must briefly address the structure of Plaintiff's gender and age discrimination claims. Plaintiff raises distinct gender and age discrimination claims in her complaint. However, in her summary judgment opposition, Plaintiff presents for the first time a joint "gender-plus-age" discrimination claim, i.e., that Vineyard Vines terminated her because she is a woman over 40-years-old.

While recognizing the import of intersectionality in discrimination claims, the Court need not analyze Plaintiff's gender-plus-age claim independent from her distinct gender and age claims. *See Bir v. Pfizer, Inc.*, 510 F. App'x 29, 31 n.2 (2d Cir. 2013) (explaining that even if the court were to consider a "gender plus" claim not explicitly raised in plaintiff's complaint, "any such claim would fail for the same reasons as her gender discrimination claim fails"); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (declining to analyze gender-plus-age or age-plus-gender claim independently from distinct gender and age claims). As the Second Circuit has explained:

> The term "sex plus" or "gender plus" is simply a heuristic. It is, in other words, a judicial convenience developed in the context of Title VII to affirm that *plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against*…The relevant issue is not whether a claim is characterized as "sex plus" or "gender plus," but rather, whether the plaintiff provides evidence of purposefully sex-discriminatory acts.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118–19 (2d Cir. 2004) (emphasis added).

Accordingly, the Court will analyze the gender and age claims independently.

### i. Gender Discrimination

It is unlawful under both Title VII and the CFEPA to terminate an employee "because of" her sex. *See* 42 U.S.C. § 2000e-2(a)(1); Conn. Gen. Stat. § 46a-60(b)(1).

### 1. Prima Facie Case

To satisfy a *prima facie* case of gender discrimination under both statutes, the plaintiff must establish that (1) she belonged to a "protected class," (2) that she was qualified for her position, (3) that she suffered an "adverse employment action," and (4) that the "adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *Clarke v. 1 Emerson Drive N. Ops., LLC*, No. 3:13–CV–690 (JCH), 2015 WL 343388, at *2 (D. Conn. May 28, 2015) (applying *Holcomb* to a CFEPA gender discrimination claim).

Here, Defendants only challenges the fourth element. Specifically, Defendants argue that 1) there is no evidence supporting an inference that Vineyard Vines terminated Plaintiff due to her gender and 2) there is no statement contemporaneous with the termination suggesting gender as a motivating factor. In response, Plaintiff asserts that 1) the most powerful men at Vineyard Vines made discriminatory comments which support an inference of gender discrimination, and 2) in line with those comments, Vineyard Vines fired numerous women.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's…invidious comments about others in the employee's protected group…or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015) (internal quotations omitted); *see Sedelnik v. City of Bridgeport,* 837 F. Supp. 2d 12, 17 (D. Conn. 2011) (finding inference of discrimination in ADEA claim based on remarks including that plaintiff is "not young enough to learn new technology" and "[s]he's too old."). "Evidence of general patterns of discrimination by an employer is clearly relevant in an individual disparate treatment case." *Culkin v. Pitney Bowes, Inc.*, 225 F.R.D. 69, 71 (D. Conn. 2004) (finding discovery request for records of defendant's involvement in prior discrimination or retaliation cases relevant to plaintiff's discrimination claim).

Plaintiff satisfies her burden. First, the pattern of terminations and resignations of at least seven other women since 2017, [Dkt. 80-7 at ¶ 15], is relevant and supports an inference of gender discrimination. *See Culkin*, 225 F.R.D. at 71.

Second, the alleged "too many older women in leadership" comments, [Dkts. 80-14 at 432:11-18; 89-1 at ¶ 112; 80-4 at ¶ 3; 80-5 at ¶ 3], are "invidious" in nature and give rise to an inference of discrimination. *Sedelnik,* 837 F. Supp. 2d at 17. Defendants argue that the comment from 2016 or 2017 is too far removed from the February 2020 termination. They fail to acknowledge, however, Plaintiff's evidence that the Murrays and/or Gaumer made such comments more recently in 2018 and 2019. [Dkts. 80-4 at ¶ 3; Dkts. 80-5 at ¶ 3].

In any event, the Court can still consider comments as circumstantial evidence or part of the sequence of events. *See Tomassi v. Insignia Fin. Grp., Inc.,* 478 F.3d 111, 115-16 (2d Cir. 2007) (explaining that even stray, remote, or oblique comments should be considered in the context of all the evidence); *Azam v. Yale Univ.*, No. 3:18-CV-1260 (AWT), 2020 WL 5803222, at *8 (D. Conn. Sept. 29, 2020) (stray derogatory comments may "help establish a prima facie case when viewed in light of general evidence about the employer's focus on or attitude about employees' protected statuses"). Thus, regardless of the exact timing, the sequence here is: as early as 2017, Ian, Shep, and/or Gaumer made discriminatory comments along the lines of there were too many older women at the leadership table and, since 2017, Vineyard Vines has fired multiple older women including Plaintiff. Plaintiff has presented evidence that a reasonable jury could find a pattern of discrimination against women that spanned multiple years immediately preceding Plaintiff's termination.

To the extent Defendants question Plaintiff's credibility because she did not want to be quoted on Ian's exact words or identify the exact meeting date, "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *Rolon v. Pep Boys--Manny, Moe & Jack*, 601 F. Supp. 2d 464, 469 (D. Conn. 2009) (quoting *McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006).

Based on the above, the Court finds that Plaintiff has satisfied her burden at the prima facie stage.

### 2. Nondiscriminatory Reason

Because Plaintiff has established a prima facie case, the burden now shifts to Defendants to set forth a legitimate, nondiscriminatory reason for the employment actions. *See McDonnell Douglas*, 411 U.S. at 802.

Defendants argue that they terminated Plaintiff's employment due to unsatisfactory performance in the following areas: 1) retail sales, 2) store profitability, 3) fraud prevention, 4) social media engagement, 5) store visitation, and 6) cross-function collaboration. "It is well established that poor performance is a legitimate, nondiscriminatory reason for termination." *Horwath v. DHD Windows & Doors*, LLC, No. 3:18-CV-1422 (CSH), 2020 WL 3316560, at *28 (D. Conn. June 17, 2020) (citing *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011).

Therefore, the Court finds that Defendants have sufficiently proffered a legitimate, nondiscriminatory reason for the termination, and the burden shifts back to Plaintiff.

### 3. Pretext

Plaintiff must now demonstrate that there is sufficient evidence for a reasonable juror to find that Defendants' proffered reason is mere pretext for gender discrimination. *See McDonnell Douglas*, 411 U.S. at 804. "Plaintiff may demonstrate pretext by reliance on the evidence that established her prima facie case, without any additional evidence being required." *Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, No. 3:16CV651 (JBA), 2018 WL 4623023, at *17 (D.

Conn. Sept. 26, 2018) (quoting *Gall v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1226 (2d Cir. 1994).

Alternatively, Plaintiff may establish pretext by showing material implausibility, incoherence, weaknesses, inconsistencies, or contradictions in the employer's proffered reason for the termination. *Legg v. Ulster Cnty.*, 820 F.3d 67, 75 (2d Cir. 2016). Indeed, "inconsistent explanations for a termination decision may suggest discriminatory motive*." Pleau v. Centrix, Inc.*, 343 F. App'x 685, 688 (2d Cir. 2009) (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000). *See also Richard v. Town of Greenwich*, No. 3:10CV225 DJS, 2014 WL 4388414, at *5 (D. Conn. Sept. 5, 2014) ("a reasonable factfinder could rationally find [such inconsistencies] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.").

### a. Discriminatory Comments

Defendants argue that there is no evidence of discriminatory animus from the decision-maker, Gaumer. Plaintiff opposes that position, arguing that not only did Gaumer make the discriminatory comments himself, but he was also present at meetings when the Murrays did as well.

First, there is testimonial evidence that Gaumer made the discriminatory comments. [Dkts. 80-4 at ¶ 3; 80-5 at ¶ 3].

Putting aside whether Gaumer made any discriminatory comments, the Court finds comments made by Ian and Shep Murray are sufficient to establish pretext. Even though the Murrays were not technically decision-makers, a reasonable jury could find that the discriminatory comments they made <u>as co-</u>

<u>CEOs</u> created a culture of "pervasive corporate hostility" that is probative of discriminatory intent.  *See Malarkey v. Texaco*, Inc., 983 F.2d 1204, 1210 (2d Cir. 1993) ("The non-decisionmaker testimony was clearly probative and admissible under Fed.R.Evid. 401….because [the testimony] showed the pervasive corporate hostility."); *Brown v. Crowdtwist,* No. 12-CV-6110 (HB), 2014 WL 1468145, at *3 (S.D.N.Y. Apr. 15, 2014) (finding discriminatory comments from individual who "was not Plaintiff's direct supervisor" but "was one of the three main decisionmakers in the firm, and undisputedly had input into Plaintiff's termination" probative of discriminatory intent); *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 275-76 (E.D.N.Y. 2013) (discriminatory comments from co-CEO, who "was not the ultimate decision maker" but "had 'input' into the [challenged] hiring decision" demonstrated a triable issue of fact as to discriminatory intent).

In crediting all factual inferences that could rationally be drawn in favor of Plaintiff, *see Green v. Town of E. Haven*, 952 F.3d 394, 405–06 *2d Cir. 2020), the Court finds there is a triable question of fact as to whether the comments constitute evidence of discrimination.

### b.  Material Inconsistencies

Plaintiff argues that Vineyard Vines presents inconsistent explanations for terminating her. Defendants disagree. The Court finds that the following inconsistencies are material and establish pretext:

*First*, Gaumer's primary explanation for terminating Plaintiff is the decline in retail sales from 2017 to 2019. [Dkt. 74-2 at ¶¶ 8-10]. However, there is evidence throughout the record that: 1) in the relevant time period, brick-and-mortar sales

declined while e-commerce, which was outside of Plaintiff's responsibilities, increased; 2) this trend was consistent across the retail industry; and 3) the Murrays and Gaumer were aware of this trend and acknowledged its impact on the decline which Defendants now attribute to Plaintiff. [Dkts. 80-4 at ¶¶ 6-7; 80-9 at 86:6-10].

*Second*, Gaumer asserts that Plaintiff was responsible for not preventing or mitigating damage from the 2018 and 2019 bulk fraud schemes. [Dkt. 74-2 at ¶ 25]. However, the third-party investigation did not implicate nor even mention Plaintiff. [Dkt. 80-9 at 137:13-142:17]. Further, Vineyard Vines terminated several employees for their role but did not reprimand Plaintiff in any way. [Dkt. 80 at ¶ 91].

*Third*, Gaumer asserts that Plaintiff failed to engage customers through social media. [Dkt. 74-2 at ¶ 12]. However, the marketing VP is responsible for social media engagement, not Plaintiff. [Dkt. 80-5 at ¶ 6].

*Fourth*, Defendants allege that they created a performance review plan and/or a goals document for Plaintiff but acknowledge never providing her with a formal written performance review plan. [Dkts. 80-9 at 47:12-23; 80-13 at 79:16-80:1, 84:20-85:8; 80-12 at 50:6-51:20, 103:25-105:15]. Creating a performance plan and failing to provide it to an employee indicates that poor performance was an "afterthought." *See Carlton*, 202 F.3d at 137 ("Plaintiff never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought. Although [the decisionmaker] insists [dissatisfaction] with [Plaintiff's] performance for years, [Defendant] continued to

employ him. Objective evidence indicates that plaintiff was performing his job adequately.").

*Finally,* the overall claim that she performed poorly is inconsistent with Vineyard Vines awarding her merit-based salary increases in 2018 and 2019. [Dkt. 89-2 ¶ at 168].

Considering the totality of the evidence, a reasonable jury could find that the Defendants' claimed reasons for termination are pretextual. Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiff's gender discrimination claims.

### ii.  Age Discrimination

To establish a prima facie case of age discrimination under the ADEA and CFEPA, Plaintiff must show that: (1) she was within the protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the discharge occurred because of her age. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 n.3 (2d Cir. 2021). Again, Defendants only challenge the fourth element.

Unlike Title VII and CFEPA, the ADEA requires a plaintiff to prove that age was the "but-for" cause of the employer's adverse decision. *Lively*, F.4th at 303.[6] Direct or circumstantial evidence may be sufficient to establish but-for causation. *Fetcho v. Hearst Connecticut Post, LLC*, 103 F. Supp. 3d 207, 214 (D. Conn. 2015);

---

[6] *Wallace v. Caring Sols., LLC*, 213 Conn. App. 606, 626 (2022) ("[W]e are persuaded that the motivating factor test, and not the but-for test, remains the applicable causation standard for claims of discrimination under the CFEPA, regardless of the federal precedent established in *Gross* and its progeny.").

*see Tatum v. Univ. of Hartford,* No. 3:19-CV-01546 (KAD), 2021 WL 4224721, at \*9 (D. Conn. Sept. 16, 2021) (finding ageist comments sufficient to establish but-for causation).

Even under the more stringent but-for causation requirement, Plaintiff has established that a reasonable jury could find Defendants discriminated against her on the basis of her age. The Court's analysis for gender discrimination applies to this claim. Namely, the pattern of terminating women over 40 years old and discriminatory comments against older women also demonstrates that Defendants would not have terminated Plaintiff but-for her age.

Not only do the aforementioned comments establish age discrimination, but also Plaintiff has submitted additional evidence of age discrimination. Taylor stated "Ian Murray said that I and other older employees were no longer what the company needed now, and that now the company needed people 20 years younger than me." [Dkt. 80-6 at ¶ 6].

In summary, a reasonable jury could find pretext given the pattern of firing older women, discriminatory comments, and inconsistencies within Defendants' purported legitimate reason for termination. *See Tatum,* 2021 WL 4224721*,* at \*9 (finding a genuine issue of material fact as to pretext given evidence of ageist comments and the plaintiff's deposition testimony demonstrating inconsistencies in his employer's claims of poor performance). Because the ADEA's "but for" standard is more stringent than that of the CFEPA, the Court denies Defendant's motion for summary judgment as to Plaintiff's age discrimination claims under both statutes.

### iii. Disability Discrimination

Similar to the ADEA, the ADA requires a plaintiff to prove that disability was the "but-for" cause of the employer's adverse decision. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). The Court assesses Vineyard Vines' intent with both the "but-for" (ADA) and the "motivating factor" (CFEPA) tests in mind.

### 1. Prima Facie Case

To establish a prima facie case of disability discrimination under the ADA and CFEPA, Plaintiff must show that: (1) her employer is subject to the ADA/CFEPA; (2) she was disabled within the meaning of the ADA/CFEPA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Here, Defendants challenge the second and fourth elements.

### a. Element Two: Whether "disabled" under the ADA and CFEPA

Under the ADA, an individual is disabled if they: (1) have "a physical or mental impairment that substantially limits one or more major life activities;" (2) have "a record of such an impairment;" or (3) are "regarded as having such an impairment." 42 U.S.C. § 12102(1).

Defendants argue that "Plaintiff's short-term, unexpected medical issue, which was unknown at the time [Vineyard Vines] decided to terminate Plaintiff's employment, fails to meet the definition of 'disability' under the ADA and CFEPA." Conversely, Plaintiff asserts that her "persistent AFib and chronic heart disease

plainly inhibit her cardiovascular and circulatory systems and render her disabled within the meaning of the statue."

There is persuasive caselaw within this Circuit that heart conditions including persistent AFib and chronic heart disease do not necessarily constitute "a physical or mental impairment that substantially limits one or more major life activities." *See, e.g, Morea v. Fanning, No. 15 CIV. 2720,* 2017 WL 3393843, at *8-10 (S.D.N.Y. Aug. 4, 2017) (finding plaintiff who suffered a heart attack and subsequent arrhythmias not disabled where her doctor testified during his deposition that plaintiff's injury was not substantial and her heart attack was minor) (citing cases); *McCaffrey v. The Long Island R. Co*., No. 08 CIV. 4602 LAP, 2010 WL 4456988, at *2-4 (S.D.N.Y. Nov. 1, 2010) (finding plaintiff diagnosed with chronic and severe nonischemic cardiomyopathy and implanted with a defibrillator demonstrated only a limitation rather than substantial limitation); *Thompson v. Fed. Rsrv. Bank of New York*, No. 01 CIV. 11640 (DC), 2004 WL 330243, at *8 (S.D.N.Y. Feb. 23, 2004) (finding plaintiff not disabled given that her cardiac fibrillation was temporary). Based on the lack of evidence that Plaintiff's conditions substantially limit any major life activity, the Court finds as a matter of law that Plaintiff is not disabled under the ADA.

In any event, the record contains evidence upon which a reasonable jury could conclude that Vineyard Vines regarded Plaintiff as having such an impairment. "A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005). "It is not

enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the meaning of the ADA, i.e., having an impairment that substantially limits a major life activity." *Id.*

Defendants argue that there is no record evidence that would support such a finding here. In response, Plaintiff asserts that Gaumer and the Murrays perceived her as disabled based on her conditions and hospitalizations which limited her ability to work at times.

First, it is undisputed that Gaumer and the Murrays knew that Plaintiff was hospitalized in September 2019. While Defendants deny knowing the nature of her hospitalization, a jury would not be required to accept that denial. Second, Defendants do not deny that Gaumer knew of Plaintiff's January 2020 heart procedure. The Court acknowledges that this is not a case with direct evidence that an employer perceived an employee as disabled. *See, e.g., Capobianco*, 422 F.3d at 60 (manager "recommended, in writing, that [plaintiff] be discharged on the asserted belief that [plaintiff] was unable to perform in title duties…due to [a degenerating impairment]."). However, a reasonable jury could find that Defendants regarded Plaintiff as disabled based on knowledge of the two hospitalizations, the underlying conditions, and the proximity between the two hospitalizations.

> b. Element Four: Whether terminated "because of" disability

Close temporal proximity between hospitalization and termination may be sufficient to establish an inference of discrimination. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (finding two-month period sufficient in

ADA retaliation case). Here, Defendants fired Plaintiff just two weeks after she returned to the office from her heart procedure. A reasonable jury could conclude based on this temporal proximately that Defendants terminated Plaintiff because of perceived disability.

### 2. Nondiscriminatory Reason

The Court's previous analysis of Defendants' nondiscriminatory reason applies. *See supra* Part III.A.i.2.

### 3. Pretext

"Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). However, the Second Circuit allows a plaintiff to "rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* (finding plaintiff demonstrated pretext by presenting evidence of discrepancies in defendant's explanation in addition to temporal proximity).

Here, the proximity between the January 2020 heart procedure and February 2020 termination, together with the inconsistencies detailed above, *see supra* Part III.A.i.3.b, defeat summary judgment at the pretext stage.

Accordingly, the Court denies Defendants' motion for summary judgment as to the disability discrimination claims.

### B. Pay Disparity Claims

To establish an equal pay claim, "a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees

perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254–55 (2d Cir. 2014); *see also Morse v. Pratt & Whitney*, No. 3:10–CV–01126, 2013 WL 255788, at *11 (D. Conn Jan. 23, 2013) (finding that CEPA claims are subject to the same standard as federal EPA claims). The comparator(s) job need not be identical, but rather must be "substantially equal." *EEOC.*, 768 F.3d at 255.

Here, Plaintiff proposes two comparators: Zamparelli and Ladley. The analysis begins and ends on the prima facie case as Plaintiff fails to establish either of them are "substantially equal" comparators.

First, Plaintiff argues that Zamparelli is a comparator because both were SVPs who reported to Gaumer. However, Zamparelli also serves as general counsel. The fact that a Zamparelli also served as a lawyer for the company means their jobs did not require equal skill, effort or responsibility, nor did they work under similar conditions.  While their roles may be similar as SVPs, Zamparelli's additional duty as General Counsel renders him not "substantially equal."

Second, Plaintiff avers that Defendants failed to produce compensation information for Ladley, and therefore, summary judgment should be denied under Federal Rule of Civil Procedure 56(d). [Dkt. 79 (Pl.'s Opp'n Mem.) 36]; *see* [Dkt. 80-8 at ¶¶ 10-13]. The Court disagrees. Discovery closed on February 22, 2022. [Dkt. 60 (Second Scheduling Order)]. The record indicates that this discovery dispute originated on or around February 4, 2022, and upon not receiving requested information, Plaintiff notified Defendants on April 29, 2022 that "Plaintiff will raise

[this] issue with the Court in our opposition." [Dkt. 80-16 (Email Thread)]. Plaintiff's proper recourse, however, should have been to file a motion to compel production. *See* Fed. R. Civ. P. 37.

In any event, Plaintiff fails to establish the second and third elements: "(2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *E.E.O.C.*, 768 F.3d at 254–55. Accordingly, it is unlikely that Ladley's compensation information would alter the Court's decision given Plaintiff's otherwise failure to establish that Ladley's role was substantially similar. *See Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 108 (2d Cir. 2017) (stating "district court was well within its discretion to conclude that Plaintiff's requests were cumulative or unlikely to alter the outcome on summary judgment"). The Court therefore finds that Plaintiff has not sufficiently demonstrated how the compensation information would have raised a genuine issue of material fact. *See* Fed. R. Civ. P. 56 (d).

Accordingly, the Court grants summary judgment as to the equal pay act claims.

### C. Aiding and Abetting

Under the CFEPA, it is discriminatory "[f]or any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so." Conn. Gen. Stat. § 46a-60(b)(5) ("Aiding and Abetting Provision"). "Case law interpreting this statute raises no question as to the applicability of this provision of the CFEPA to individuals." *Schaefer v. Gen. Elec. Co.*, No. 3:07-CV-858PCD, 2008 WL 2001244,

at *3 (D. Conn. May 8, 2008) (listing cases). "Where more than one person is allegedly involved in an employer's discriminatory practices, a plaintiff may be able to show that an individual defendant aided the employer's discriminatory practices by colluding with other employees to perpetuate the alleged discrimination." *Id.* Plainly, the Aiding and Abetting Provision "contemplates liability for a party who in some way helps or compels another to act in a discriminatory manner." *Id.* at 4.

Defendants first contend that Plaintiff's claim fails as a matter of law because Plaintiff does not establish an underlying violation of any anti-discrimination law. In the alternative, Defendants assert that there is no evidence that the Murray Brothers aided or abetted decisions regarding Plaintiff's compensation or termination.

Plaintiff opposes Defendants' position, arguing instead that the Murrays' comments of "too many middle-aged women" aided, abetted, and coerced the discriminatory termination of Plaintiff and other older women. Plaintiff further asserts that the Murray brothers have profound influence over personnel decisions and participated in and reviewed decisions compensation decisions as well as hiring and firing decisions.

In their reply brief, Defendants assert that Plaintiff's arguments do not create a dispute of material fact because 1) the alleged comments are inadmissible as speculation and conjecture and 2) the influence argument is amorphous and indirect.

The Court finds Defendants' arguments unavailing. *First*, the Court has already determined that 1) Plaintiff's gender, age, and disability discrimination

claims survive summary judgment and 2) Plaintiff presents admissible evidence that the Murrays made the discriminatory comments. *Second*, Defendants own deposition records demonstrate that the Murrays actively participated in meetings throughout 2019 discussing Plaintiff's performance and (eventual) termination. *See* [Dkt. 80-12 at 53:6-54:22]. *Third*, while Gaumer was the decisionmaker, he actively sought input from the Murrays prior to terminating Plaintiff. [Dkt. 80-9 at 51:19-25]. *Fourth,* the Murrays were also directly involved in hiring senior management and executives at the headquarters office, i.e., candidates could not fill these positions could not without the brothers' approval. [Dkt. 89-2 at ¶ 241]. Based on that evidence, a reasonable juror could find that the Murrays aided and abetted discrimination in violation of the CFEPA. *See Spiotti v. Town of Wolcott*, No. 3:04–cv–01442 (CFD), 2008 WL 596175, at *1 n.1 (denying summary judgment on CFEPA aiding and abetting claim given genuine issues of material fact regarding whether individual defendants made gender-based comments and perpetuated a pattern of discrimination).

Accordingly, Defendants' motion for summary judgment is denied as to the aiding and abetting claim.

IV.   **CONCLUSION**

For the above reasons, summary judgment is DENIED on Counts III through IX and GRANTED on Counts I and II.

**IT IS SO ORDERED**

_____/s/_____

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: December 29, 2022**